Pages 1 - 48

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

OIP TECHNOLOGIES, INC.,           )
                                  )
            Plaintiff,            )
                                  )
   VS.                            ) NO. C 12-1233 EMC
                                  )
AMAZON.COM, INC.,                 )
                                  )  San Francisco, California
            Defendant.            )  Friday
                                  )  July 13, 2012
_____  )  2:00 p.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff:**        TENSEGRITY LAW GROUP, LLP
                          555 Twin Dolphin Drive
                          Suite 360
                          Redwood Shores, California 94065
                    BY:   **MATTHEW POWERS, ESQ.**
                          **PAUL EHRLICH, ESQ.**
                          **STEFANI SMITH, ESQ.**


**For Defendant:**        LATHAM & WATKINS, LLP
                          555 Eleventh Street NW
                          Suite 1000
                          Washington, DC 20004
                    BY:   **MATTHEW MOORE, ESQ.**
                          GREGORY GARRE, ESQ.

                          LATHAM & WATKINS, LLP
                          140 Scott Drive
                          Menlo Park, California 94025-1008
                    BY:   **RICHARD FRENKEL, ESQ.**


*Reported By:    Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                 *Official Reporter - US District Court*
                 *Computerized Transcription By Eclipse*

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

P R O C E E D I N G S

**JULY 13, 2012**                                                    **2:21 p.m.**

**THE CLERK:**  Calling Case C12-1233, Oip versus Amazon.com.

Counsel, please come to the podium and state your name for the record.

**MR. POWERS:**  Good afternoon, your Honor.  Matt Powers, Paul Ehrlich and Stefani Smith for the plaintiffs.

**THE COURT:**  All right.  Good afternoon, Mr. Powers.

**MR. MOORE:**  Good afternoon, your Honor.  Matt Moore from Latham and Watkins on behalf of Amazon.  With me...

**MR. GARRE:**  Greg Garre, your Honor, on behalf of Amazon as well.

**THE COURT:**  Thank you.

**MR. FRENKEL:**  And Rick Frenkel, your Honor.

**THE COURT:**  All right.  Good afternoon, gentlemen.

Maybe, Mr. Powers, you can help me understand.  What does this patent teach besides the process or art of, putting it crudely, graphic a demand curve.

As I understand it, the idea is you do these little, almost like mini surveys or mini tests and you get a response at each different price point through these various submarkets or something.  From that you can aggregate things, figure out essentially a demand curve.

What else does it do besides that?

**MR. POWERS:** Is your Honor's -- may I ask a clarification question?

Is your Honor's question about what does the specification teach or what do the claims at issue require?

**THE COURT:** Well, I guess both.

**MR. POWERS:** Let's start with the claims, because I think that's what the motion is about.

The motion really is addressed, I believe, to whether the claims are directed to patentable subject matter. It's not an enablement motion. It's not a written description motion.

And so the inquiry, particularly under the *CLS Bank* case, is do those claims merely claim what Amazon is contending to be the abstract idea? And the abstract idea in this instance, according to Amazon's motion, is price optimization.

And so the legal inquiry under the *CLS Bank* case, which the Federal Circuit decided four days ago, the legal inquiry starts with a procedural burden, and the procedural burden that the *CLS Bank* case decision applied four days ago is quite high, and it's higher than most of the burdens that are imposed on motions of this type. And what the *CLS Bank* case said was that it had to be manifestly evident that it is only the abstract idea of price optimization.

And the *CLS Bank* case, of course, refers to District Court's finding that the claims were not patentable subject matter.

But even more important perhaps even than the requirement of this manifestly evident -- in other words, it has to be so obvious.  And Judge Rader's comment in prior decisions as well says basically it has to be so obvious that it's merely the abstract idea before you can grant a motion to dismiss.

The *CLS Bank* case also says that the single requirement is that the single most reasonable understanding is that the claims add nothing to what is contended to be the abstract idea.  So that's the procedural posture and burden that *CLS Bank* imposes upon Amazon's motion here directly responsive to the question that your Honor is raising.

So now let's go to the substantive burden on that question, and the substantive burden then becomes:  Is what is claimed merely the, quote, unquote, abstract idea or are there any other requirements that are imposed beyond that?

Now, the mere abstract -- and I think it's fair to say that there are certainly several cases, both Supreme Court and Federal Circuit, on both sides of that line.  And it's also fair to say, I think, as Judge Rader said and as Judge Linn said in *CLS Bank*, that the definition of an abstract idea is hardly easy in terms of how the legal standard is presented from the Supreme Court and Federal Circuit.

So your task is not a simple one, but it is -- in face of that, in fact because of that, that Judge Rader and Judge Linn imposed this very high procedural burden.

So then the question is:  How do you resolve that question of whether the claim merely claims the abstract idea or something else?

And what *CLS Bank* teaches and requires is exactly what our opposition said would be required and exactly what Amazon's motion and reply speculated could not be required.

Fortunately, here we have the Federal Circuit answering four days ago that debate in the briefing.  The briefing, of course, is a little out of date because both sides are sort of speculating how the Federal Circuit will resolve these cases that are on two competing sides.

Amazon is saying:  Well, *Deere* is really this outlier.  No one would possibly apply that to a financial type of case.  And we said:  No, we don't think that's right.  We think the Federal Circuit would resolve it that way.

And fortunately for us, four days ago the Federal Circuit did so.  And they did so precisely on the ground that we said should be the harmonizing principle underlying all these cases. And that harmonizing principle is whether the claims, as drafted, truly would, quote, monopolize, close quote, the abstract idea.

In other words, the legal requirement under *CLS Bank*, which is exactly what we said under the opposition it should be, which is:  Could you do price optimization -- the abstract idea which Amazon contends is monopolized, could you do that

without infringing these claims?  That's the standard.  That's the preemption standard that *CLS Bank* talks about, that *Bilski* talks about, that *Mayo* talks about.  That's the unifying principle.  That's how you decide whether the claims are or are not directed to merely the abstract idea.

And we showed on Page 13 of our opposition brief nine examples of how one could price optimize, and there are many others that do not infringe.

**THE COURT:**  Just because there are many ways to price optimize doesn't necessarily mean that you've got a problem. If you take one method of price optimization that is well known, let's say it's a textbook example, and you try to patent that and monopolize that, take that out of the arena, just because there are other methods of price optimization, theoretically I don't think saves you.

I'm more interested in -- first of all, I don't understand.  What is the price optimization principle here? Maybe that gets into another issue, but other than gathering this data, what is the price optimization?  Is it just a maximum revenue generation based on volume or what is it?

**MR. POWERS:**  Not at all.  So let's back up because I think your Honor is raising the right question.

I would reframe it slightly.  Under *CLS Bank* you first ask yourself:  What is the abstract idea that is claimed to be monopolized?  And according to Amazon's motion, that is the

concept of optimizing a price.  And they phrase that -- they use that language many, many times throughout their opening and their reply brief.  They have a couple of different phraseologies saying perhaps optimizing a price based on consumer behavior.  So let's take that as being the abstract principle.

There is no, I think, reasonable doubt that these claims do not monopolize that abstract idea, and that's the requirement of *CLS Bank* and *Bilski* and *Mayo* and all of the cases.  Why?  Because you can optimize a price, i.e., select a price based on consumer behavior in many, many ways other than what this claim says.  And I'll give you many examples.

So, for example, one way, which we pointed out in the opposition -- and these really are not responded to.  There is no debate from Amazon in its reply that there are -- they do not dispute that there are many alternate methods that would not infringe the claims that could practice what they call the abstract idea.

In fact, at Page 9 of their reply, they say, well, that's really ominous.  That's really their primary response.  And it's not ominous because the whole point of *CLS Bank* is if you can do that abstract idea in other ways, then you're not monopolizing the idea.

And here there is no debate -- your Honor is --

THE COURT:  You're just saying, what if what this

claim covers is price optimization by simply maximizing revenues; volume times price, finding that price on the demand curve and maximizing that.  And you come back and say, Well, okay.  We monopolize that procedure, but there are other ways. You can do cost analysis.  You can do other types of, you know, dynamic prices, other things.

MR. POWERS:  I understand your question.

THE COURT:  It seems to me not a fair argument.

MR. POWERS:  I understand the question, but that's not what the claim says.

THE COURT:  Tell me what the claim says.  I'm trying to figure it out.

MR. POWERS:  Fair question.

The requirements of the claim are not that you price optimize by saying, "I'm going to maximize revenue" or, "I'm going to maximize profit."

But the claim doesn't have a specific outcome that's required.  Instead it dictates the process by which you do that, and that process is limited.  It's not any process by which you price optimize.  It's a -- it's a very specific process where you send offers out to consumers by electronic format, obviously, in these claims with a price attached.  You then gather statistics on what happens to those.  Based on those statistics, you then create an estimated outcome.

THE COURT:  At different prices?

**MR. POWERS:**  You could say --

**THE COURT:**  A plurality of prices.

**MR. POWERS:**  You could say:  Here is the outcome I wish to achieve.  And then you send out your next price based on the estimated outcome.

That is classic under *CLS Bank*.  There is -- in my view, there is no possible way to distinguish these claims from those found patentable in *CLS Bank*.  Every single argument that Amazon makes would apply more to the *CLS Bank* claims than they would to ours.

And the key question before your Honor -- and your Honor has touched on what the issue is.  So let's take, again, *CLS Bank* has a very, I think, straightforward analytical framework.  The straightforward analytical framework is:  First you decide what the so-called or putative abstract idea is.  Amazon motions -- Amazon's motion answers that for us by saying the abstract idea that they contend is claimed is price optimization based on consumer behavior.

*CLS Bank* says, All right, the question is:  Could you do that abstract idea in a way that does not infringe these claims?  If the answer is no, in other words if you -- if -- whenever you try to price optimize, you have to infringe these claims, then those claims under *CLS Bank* would be not patent eligible.  They would fail 101.

But if you could practice that abstract idea, price

optimization, without infringing the claims because of limitations in those claims, then it does not monopolize the abstract idea and it is patent eligible.  And that's the point.

So here you could price optimize using consumer behavior in multiple ways without infringing these claims.  A classic example is market research.  Market research would not constitute sending out offers.  You do surveys.  You call consumers.  You do -- you hire a marketing survey company.  There are a myriad of ways that companies do that every single day, probably including Amazon.  That would be -- and then you say:  Based on that market research, I think I should price my products at price X instead of price Y.  That is price optimization and it's even price optimization based on consumer behavior or consumer input.  But it clearly does not infringe these claims.  There is no offer at all.

A second basis would be any form of auction.  That's a form of price optimization for sure.  It changes the price and, yet, it does not have an offer that is within the scope of these claims.  That's called out in the specification.

There are -- another example is that you could canvass or survey competitor prices.  So you could say to yourself:  I'm selling good X and I'm going to go out -- and you could do that in an automated, electronic way or manual or anyway you wanted. You could say:  I'm going to survey what that product X is being charged for by all my competitors out there online and

elsewhere, and I'm going to take the average of what those prices are.  That's price optimization, the abstract idea.  Clearly, does not infringe these claims.

So there is not on this record a credible argument that the standard imposed by *CLS Bank* can be met.  And Amazon's reply doesn't even argue that it can.  Because the abstract idea as phrased by Amazon, the entire basis of its motion, can be practiced in multiple independent ways that are not the subject of this claim and, therefore, this claim does not monopolize them.

And, indeed, Amazon's motion repeatedly says, everybody out there tries to price optimize somehow and they all do it in different ways.

**THE COURT:**  So the key in the key limitation is, is the fact that you have an offer or multiple offers; that it is -- it is price optimization based on a process that is not based on research, comparing, competitors or anything else, but the process of actually offering different price points or through a plurality of prices the product by which then you determine the optimum price.

**MR. POWERS:**  That's one of four key limitations.  That limitation that you just discussed is one that differentiates many other forms of price optimization and shows that this is merely one specific category of those.

Now, one of Amazon's -- let me just talk about the other

three quickly so we at least have them on the table.

One is it has to be done in electronic format.  You're sending out these offers electronically.  So if you don't do that, then you're not infringing these claims.

The third is that it's not using the vending machine or kiosk model because one of the limitations of the claim is that the device to which the offer is sent can't itself fulfill the offer.  It can't provide the product.  That's an explicit limitation in the claims.  That is another way of price optimization that had been used beforehand.  And it was put in the claims to distinguish that prior art.

So people are free to use any form of price optimization they want, many of which Amazon refers to or alludes to, and many of which the specification alludes to as long as it doesn't infringe these claims.

The fourth, of course, is this estimated outcome limitation in the claims.  It's not just that you are sending out offers to perspective customers and gathering statistics on what people bought at what prices.  You are also from that data computing an estimated outcome.  That's a very specific limitation.  And that limitation -- and that limitation is the basis, that estimated outcome is the basis for your next decision on pricing.

**THE COURT:**  What does that mean "estimated outcome"?  If you price it at X, you'll sell this many?

**MR. POWERS:** Well, the dependent claims and the specification give examples. So you could say to yourself -- different people will have different objectives.

Let's say, my objective, because I have too much inventory, is -- the estimated outcome that I wish to achieve is to maximize the number of units sold. That might produce one price. And you would say, I want to estimate the price, the outcome at which I sell the most product. Independent of profit, for example. That would -- and then that might be price A.

Another estimated outcome might be: What produces the most revenue for me? That might be price B.

Another might be: What produces the most profit, marginal return? That might be price C or D.

So the point is that an estimated outcome is different things for different people, but there's a requirement that anyone who is doing this specific claimed method has to be pricing based on that estimated outcome.

**THE COURT:** Why isn't that limitation itself just an abstract idea? It's just Econ 101.

**MR. POWERS:** It's --

**THE COURT:** You know, the demand curve and if you know other factors, marginal cost or whatever it is, it's -- to derive your estimated outcome you just figure out what your inputs were.

**MR. POWERS:** We're not questioning whether the math is difficult. That's not the basis for our opposition to the motion.

And, certainly, the *CLS Bank* case says you can use simple math and basic rules like the supply/demand curve. The issue is: Do you add anything more to that?

And this is saying that you're not just pricing, for example, based on I see that everybody buys it at price X, therefore, I'll price it at price X. Instead, you have to say, here is the outcome I'm going to estimate. I'm going to estimate an outcome. You may not do that. You could price optimize without doing that.

So those are the four primary limitations in the claim that if not practiced, you can price optimize without them. And when you look -- and I just do not think there is any way you can take the claims that are at issue in the *CLS Bank* case and distinguish them meaningfully from the claims at issue in this case.

*CLS Bank*, the Federal Circuit reversed the District Court's finding that those were not patent eligible; that they were not patentable subject matter, finding that they were patentable subject matter. And if those claims are patentable subject matter, these have to be.

There is much more meat in these claims than there was in the *CLS Bank* claims. The unifying principle in *CLS Bank*

applies with even greater force here.

If there are ways to practice that abstract idea that don't infringe, the motion should be denied.

**THE COURT:**  Why isn't this case more like *Bilski*?  I mean, if formulas for hedging against risk process is not patentable, why is finding estimated outcomes or deriving price optimization any different?

**MR. POWERS:**  Because this claim isn't just any form of price optimization.  The primary distinction is the Supreme Court found in *Bilski* that that covered every way of hedging.  It covered the basic idea of hedging with no limitations.

Just as in *CLS Bank*.  And the *CLS Bank* had a very careful analysis of *Bilski* and all the Federal Circuit decision which Amazon relies and all the Supreme Court authority, and said quite clearly that *Bilski* falls into the camp of monopolizing the abstract idea.  In other words, there wasn't a way to hedge that didn't infringe.  So that's the legal test.

And *Bilski* said there wasn't a way to hedge without infringing, therefore, you're patenting the abstract idea.

Here, there are multiple ways to price optimize, because -- let's be clear.  The claims do not just say "price optimize."  And just as in *CLS Bank* and just as in *Research Corp*., here the claims don't monopolize the abstract idea because you can perform the abstract idea or practice the abstract idea without infringing; and if so, it doesn't

monopolize the abstract idea and it is patent eligible.

**THE COURT:**  All right.  Let me hear from you Mr. Moore.  What's your response?

**MR. MOORE:**  Thank you, your Honor.

First, we do think this is quite a deal more like *Bilski* than *CLS*.  And, of course, the Supreme Court's word has final say over anything that the Federal Circuit has, but we don't think the *CLS* case is at all inconsistent with *Bilski*.

And more fundamentally, we don't think that my friend has identified any conceivable or meaningful limitation on the abstract principle of officer-based pricing.  They can't take the abstract concept of price optimization and say:  Well, we're only claiming offer-based pricing.  That would be like saying, We're not claiming the law of gravity.  We're only claiming the law of gravity for objects over 100 pounds.

It still doesn't -- the part that they are claiming is still undeniably an abstract principal.  When you think about the breadth of what they are claiming, it's quite extraordinary in terms of what would be preempted.

Any time someone determines an optimal price with the objective of profit maximization or revenue output, the other of the criteria my friend just mentioned, in an electronic commerce marketplace they would be infringing that patent under the view that was just pronounced.  And that's an extraordinary --

**THE COURT:** If it was offer based.

**MR. MOORE:** If it was offer based, your Honor, but offer based is not a meaningful limitation. It's just a way of describing the abstract principle.

And most pricing, after all, is going to be offer based. And if this Court holds that offer-based pricing is patentable, then the next patent in the door is going to be MSRP based pricing or other pricing. And that's just carving up the abstract principle into things that are just as abstract, just a narrower claim on that. And that's not what *Bilski* allows. It's not what *CLS Bank* allows.

First of all, the *CLS Bank* case didn't change the law at all. It could not have changed the Supreme Court law and it did not change Federal Circuit law.

The manifestly evidence standard that my friend mentioned was the law at the time that *CyberSource, Dealertrack* and *Fort Properties* were decided. In all of those cases the Courts correctly concluded that the abstract principles at issue did not become patentable because they were run over a computer program or described in the sorts of ways that my friend has tried to dress up the patent here.

And so if your Honor wants to know what "manifestly evident" means, I think the Court's prior cases in *CyberSource* and *Dealertrack* and *Fort Properties* tell you what it means. And in those cases the Court found that the principles and

method for detecting credit card fraud over the internet or in electronic exchange for loans using the computer as a clearinghouse over an electronic environment did not become patentable.  I think with respect that the claim here is even less patentable than the claims found deficient in those cases.

And I think it's in stark contrast to the claim in the *CLS Bank* case.  If you look at the Court's opinion, the Court said two things that I think are particularly important for your Honor here.

First, it made clear that the claims at issue in that case weren't simply trying to get a monopoly on the use of intermediaries to manage settlement risks in an electronic environment.  What the claims in that case did, were to use the computers and claim the creation of what were shadow records. That was in the claim itself.

And that's what the Court of Appeals emphasized on Pages 26 and 27 of its opinion; that it wasn't -- the claims in that case were not claiming, simply claiming the use of an intermediary to manage settlement risks in an electronic environment.  They used the computers in a particular way that greatly limited the sorts of -- the concept that would be preempted.  You had to use the computer to create these shadow records which is how the settlement risk was managed.

There is nothing comparable to the creation of the shadow records with respect to the patent in this case.  In their

opposition to our motion to dismiss the one thing that they kept coming back to again and again as the key component of what their claims added was the fact that it created a more efficient, automated, more dynamic process for price optimization.

I think that was almost on every page in the brief. At least it was repeated as a central theme of its brief as to what made their patent different and why the use of the computer was so important.

**THE COURT:** So the fact that computers are used to generate a sufficiently large number of offers and in gauging their responses and deriving from that some kind of price optimization, you feel is different than the role that the computer systems played in *CLS* because they created shadow records.

**MR. MOORE:** That's right. In our case they are using the computer to do what computers do. They do things more quickly and more efficiently.

On Page 18 of the *CLS Bank* case the Court specifically distinguished that role, and what it said was:

"Where the addition of a machine imposes a meaningful limit on the scope of a claim and plays a significant part in permitting the claim method to be performed."

And that's what the Court concluded the shadow records in

that case did on Pages 26 and 27.  And then they distinguished:

"Rather than functioning solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer to perform the calculations."

Well, what the computer is doing here is generating -- is emails and calculating what they call the optimal price more quickly.  That's exactly what *CLS Bank* says does not create a meaningful limitation and that's exactly what the Supreme Court recognized in the *Benson* case and, again, in the *Mayo* case is not sufficient.

And it's exactly what the Court, the Supreme Court found unpatentable in the *Flook* case.  In the *Flook* case you had the claims that did essentially the same things:  Gather data and adjust the alarm limits for purposes of what all agreed was an abstract concept, the mathematical concept of catalytic conversion.  And the Supreme Court in that case said, no, that wasn't enough.  Gathering data and adjusting the alarm limits, that wasn't enough.  That wasn't a meaningful limitation.

And that's all the claims in this case do.  They say, go out and gather data based on pricing from offers, which is the age old way of determining how to price a subject.  And then adjust that, adjust the offers, adjust the price using a computer.  And that's exactly what the Supreme Court and the

Federal Circuit has held is not patentable.  And then you look at, well, what's missing?  What's missing in this case is anything remotely like the shadow records.

My friend referred to four things as limitations.  The first is that this was offer-based pricing.  But as your Honor rightly pointed out, the fact that you can engage in pricing in other ways doesn't make offer pricing -- offer-based pricing any less abstract.  So that can't be a meaningful limitation.

The second was the fact that this was is in an electronic environment.  Well, *Bilski* tells you that that's not a meaningful limitation because *Bilski* made clear that the fact that the concept in that case, hedging, was limited to the field of use of energy and commodity markets didn't prevent -- didn't make that a patentable concept.  The Court in that case reiterated that such a field of use limitation is not sufficient to make an abstract principle patentable.  And that's exactly why electronic commerce in this case is not a sufficient limitation to make it patentable.

And then he referred to what I took as a way of emphasizing the breadth of what they are claiming, saying that any time you're trying to price optimize based on either the units sold to produce the most revenue or to maximize profit, that's what they are claiming.  Well, my gosh, that's an extraordinarily broad principle to be claiming when it comes to pricing and electronic environment.

We're talking about an environment of hundred of billions of dollars each year in the marketplace.  And what they are claiming a monopoly on is any time anybody goes out there and determines what the best price is based on evaluating the offers that have been made for prices.  That's an extraordinarily broad claim.

And that's another way in which the *CLS Bank* case is on point in a way that harms my friend, and that's -- the Court claims clear that where the claimed concept has -- it preempts many other uses, has broad preemptive effect in a way that would not foster innovation, but discourage it.

**THE COURT:**  Does it have to be complete preemption, monopolize the entire field of that abstract idea?

**MR. MOORE:**  Well, for example, in *Bilski*, your Honor, the fact that hedging was limited to the energy and commodity markets, that didn't make it patentable.

Here the fact that it's pricing based on offers as opposed to MSRP doesn't make it patentable.  And if it did make it patentable, your Honor, then every aspect of pricing would be patentable under Section 101, and that can't be the right answer.

All they have done is taken the abstract concept and tried to carve out a specific -- a specific component of that abstract concept.  And that's quite different than doing what the claims in the *CLS Bank* case did, which was to take the

abstract concept and add a meaningful practical limitation, which was the use of the computers to create these shadow records, which the Court emphasized limited the preemptive scope on that.  And there is simply nothing like the shadow records in the claim at issue in this case.

I would say, too, that in their opposition brief my friend said that the machine or transformation test was now defunct.  That was wrong based on Supreme Court precedent.  The *CLS Bank* case recognizes that it's wrong as well.  The machine or transformation test is still what the Supreme Court called an important and useful guide to determining patentability.

Here there is no question that the claimed -- the claims have no transformative effect on anything, which is another reason why the *Deere* case is completely inapposite here.

And with respect to whether or not the machine prong is met, the Federal Circuit has held that in the *CyberSource* case, *Dealertrack* case, the fact that a claim uses a computer is not sufficient to make it a machine for purposes of that prong.  So for the same reasons here the fact that the claims are purported to being implemented over a computer does not make it patentable.  That's something that the *CLS Bank* case itself says several times.

And so I think the reason why they claim that the machine or transformation test is defunct is because they realize that they can't satisfy that test.  I'm not aware of any patent

where a Court has found that the machine or transformation test has been flunked, but held that it's patentable.

It's conceivable we know based on the Supreme Court precedent, but I don't think this is the case where the Court would want to be the first to do that because the claims flunk *Bilski*, *Mayo*, *CyberSource*, *Dealertrack*, all the other most recent precedents from the Supreme Court and the Federal Circuit.  Holding that the claims at issue in this case were patentable would take the law completely in the direction at odds with *Bilski*, at odds with the reaffirmation of *Bilski* by the *Mayo* Court, just this term, and it would be entirely inconsistent with the Federal Circuit's precedents, including the *CLS Bank* case.

Now, there is one other component of our motion, your Honor, I just want to touch on briefly and that deals with the claim of willful infringement.  We think that that's just a patent pleading defect because all they had pleaded is that Amazon had knowledge of the pending application.  They haven't pleaded that Amazon had knowledge of the fact that it was issued.  In any case, that would be a fatal defect.  In this case it's especially fatal given the prosecution history, which is that this patent was pending for some nine years during the course of which it had been rejected, I think, at least nine times.

So that in itself is a fatal pleading defect that we think

has to be preempted, but I think that that defect is swallowed up with the more fundamental defect; that the claims at issue in this case simply don't pass the subject matter eligibility requirement that the Supreme Court just months ago emphasized is an important threshold test for establishing patent eligibility before a case like this can proceed down the road any further.

MR. POWERS:  May I respond briefly, your Honor?

THE COURT:  I will give you the last word.

MR. POWERS:  Thank you, your Honor.

First with respect to the 101 question.  I would like to begin by answering the question that your Honor asked, which I think is the key question:  Does it have to monopolize the entire abstract idea or is it enough to support their motion that it be very broad?

That question, you didn't really get an answer to.  And that question is answered by *Bilski* and *CLS Bank*.

*Bilski* at 130 Supreme Court 3231 says it would effectively, quote, grant a monopoly over an abstract idea.

And *Mayo* at 1299 says effectively the same thing.

And the *CLS Bank* case -- which is, of course, the Federal Circuit's most recent pronouncement harmonizing all of these cases -- goes on at great length at Pages 1415 and -16 on this precise question.  This is the central holding at *CLS Bank*.  And it's attempting to do what this motion asks your Honor to

do, which is to harmonize all these cases on both sides of the question.

So Amazon is, of course, right. There are several cases finding certain claims to be not patent subject matter eligible, but there are also several other cases finding other claims to be subject matter eligible.

And what *CLS Bank* says is, the way you try to figure out the difference between them is whether there was -- and if you look at Page 15, they really summarize a lot of the cases, your Honor. They quote *Bilski* saying, "A monopoly over the abstract idea."

They quote *O'Reilly*, another Supreme Court case, "exclusive right to every improvement."

They talk about the *Morris* case, "shut the door against inventions of other persons."

They cite *Gottschalk v Benson* as, "wholly preempting the mathematical formula."

That was -- that is the deciding question. So the question your Honor asked is precisely the issue.

**THE COURT:** But doesn't that still beg the question? I mean, what is the abstract idea that's being preempted or monopolized? What is the field?

**MR. POWERS:** Exactly.

**THE COURT:** And is the field price maximum -- price optimization period? Price optimization based on an offer

process?  Price optimization based on consumer behavior?

I mean, how does one define -- I mean, it's almost -- you know, your definition kind of controls the outcome here.

**MR. POWERS:**  Well, that's, I think, precisely right and there is two answers to that.

The first is, the motion is blindingly clear about what Amazon's motion was based on.  If you look at Page 2, Page 3, Page 8, Page 9, Page 10 of the original motion and reply brief Page 1, they say unambiguously, without qualification, the abstract idea that they contend is the one at issue is price optimization.  That's it.

Now, there is no debate.  You haven't heard one in the briefing and you didn't hear one today, that one can price optimize using many techniques -- market research, auctions, all the things that we have talked about before -- without using an offer-based system of the type in the claims.

So then just this afternoon there was a not so subtle shift in Amazon's argument, and the not so subtle shift was to try to change the, quote, abstract idea from that upon which the motion was based to offer-based price optimization.

Well, doing that makes the entire argument circular, because once you define the abstract idea as being what the claim says, of course, you monopolize the abstract idea as part of the claim.  But that doesn't work.  It doesn't work because the abstract -- you can't define the abstract idea so narrowly

that it's concrete.

THE COURT:  Well, but conversely what if you had a different patent that did the converse?  It monopolized the field of price optimization based on competitive pricing?  It did automatic surveying.  A computer used a survey that --

MR. POWERS:  You can have --

THE COURT:  In fact, they probably have something like that, where there is -- Price Grabber or something like that, you can survey the field.

MR. POWERS:  I agree.

THE COURT:  And can you claim that?

MR. POWERS:  You can have -- because there are probably 100 or 200 ways to do this, you can have 100 or 200 patents covering each individual way.

THE COURT:  What if it's just a broad patent that generally covers surveying competitive prices in order to set your price optimization.

MR. POWERS:  That would not monopolize the abstract idea of price optimization, clearly not.  Neither would a patent that says let's use a reverse auction.  And if that patent had been issued 20 years ago, or whenever, whenever that process started, that would be a subject matter eligible patent.

The point is, that the -- under *CLS Bank* and under the Supreme Court decisions, once you've defined the abstract

idea -- and that has to be at the level of the abstract idea. You can't make the abstract idea so concrete that it's now no longer abstract.  The abstract idea, as the motion framed it -- and in fairness I think the motion properly framed it that way -- is price optimization.  That is the abstract idea.

And if you had a claim that said optimize pricing and do it on a computer, all the cases I think would teach that isn't enough.  That's not subject matter eligible.

But what *CLS* and the other cases teach is if there are multiple ways to price optimize, you can claim one of them. That doesn't run afoul of 101 because you have not monopolized the abstract idea.

**THE COURT:**  All right.  Well, let me -- I said I would give you the last word, but let me ask you to reply because that's very specific.

Is that what you're claiming; that the monopolization here is of price optimization as suggested on Page 2 of your brief, or is it more specific; that is, price maximization based on -- on offer --

**MR. MOORE:**  Your Honor, I think ultimately it's price optimization, but it doesn't matter whether you think of it as price optimization or the way they have characterized it, price testing based on offers in an electronic commerce environment.

The point of the Supreme Court's jurisprudence that you can't patent fundamental truths and economic principles was not

that you can't patent it in one patent, but you can't patent it in 200 patents by slicing it up. And the way that the Supreme Court has made this clear, it reiterated in the *Mayo* case just this term.

I'm reading from Page 15 of the slip opinion where the Court says:

"*Flook* established that limiting an abstract ideal to one field of use or adding token post solution components does not make the concept patentable."

And that's really what's going on here, your Honor. They can't take the abstract concept of price optimization and say, we're just limiting it to offer-based price optimization or we're just limiting it to price optimization over the internet. That doesn't work for the obvious reason that that -- that that necessarily means that everything else of the abstract principle of price optimization could be patented. You just have to splice it up into different patents. And that -- then the patent laws would take that economic concept away from mankind to use freely, which is the basic thrust of the Court's precedence in this area.

The supply and demand curve does not work without offers. It's hard to think of a more fundamental economic concept than offer-based pricing. And they can't avoid the inescapable conclusion that that is not patentable by coming up with an

even more abstract, even broader category of conduct that would not be patentable, like pricing or price optimization.

Either way you look at it, it flaunts the Supreme Court's jurisprudence, as well as the Federal Circuit's jurisprudence. And that includes the *CLS Bank* case because, again, there is nothing remotely like the claim limitation that the Court found in *CLS*, the use of the computer to create these shadow records which fundamentally limited the principle that was claimed there in this case. They have identified nothing at all, your Honor.

**MR. POWERS:** May I respond briefly?

**THE COURT:** I will give you the last word at this point.

**MR. POWERS:** Thank you.

I have a very short amount on that, but I would like to respond briefly on the willfulness questions, if I may.

**THE COURT:** Yes.

**MR. POWERS:** With respect to the 101 question, counsel argues about the computer creating the shadow records being the distinction in *CLS Bank*. I respectfully disagree about the reading.

What's very clear about *CLS Bank* on the pages that I cited to you earlier, 14, 15 and 16, is this concept of monopolizing the entire abstract idea was the linchpin.

In fact, if you look at the next pages, 16 through 18,

it's at those pages that the Federal Circuit addresses the machine or transformation test and addresses the questions that counsel is pointing out here.

The very first thing that *CLS Bank* does is say, well, machine or transformation test doesn't really work well for a lot of modern non-mechanical types of inventions.  And it goes on to say, that's really not the linchpin of this.

And I think when you read the *CLS Banking* decision, you look at the claims that were addressed there and the reasoning of CLS Bank, it is not possible to find a path by which those claims are patent eligible and these claims are not.  There is no meaningful distinction.  And that is the Federal Circuit's most current, clear reading of the law and the law of the Federal Circuit.

The only other point I wanted to make on the 101 issue is to disagree on a very specific issue of law that was just raised.  Counsel argued that if you have an abstract idea, like price optimization or hedging or any one of them, and there are 100 ways to do it, that you can't get 100 patents on the hundred ways.  That's just absolutely the wrong conclusions from *CLS Bank*.

If you read *CLS Bank*, what it says is, is if you're trying to claim just the abstract idea, you lose.  If you're claiming a way to use that abstract idea, one particular way -- and there are other ways -- you win.  And that's these facts.

I have given you now several examples of how one can practice the abstract idea of price optimization.  And we have an agreement with counsel that that's the abstract idea at issue.  Not down to the granular level of offer based.  Offer based is merely one way of doing it.

And the proof in the pudding, your Honor, if I may, is just some common sense.  Amazon's opening brief and reply brief both say everybody does some form of price optimization in an online environment, and even not in an online environment.  Everyone, from the beginning of time to now.  That's basic.

And counsel's briefs admit that there is many ways to do it, and the patent shows there's many ways to do it.  Many of those ways would not infringe these claims.

Under *CLS Bank* that's the end of the inquiry.  If you can price optimize without infringing these claims -- in other words, if there are other ways to do the abstract idea -- that's the end.  And the fact that the claim is broad is irrelevant for 101 purposes.  It may be relevant for 102, 103 or other issues, but 101 doesn't address that.  101 has a very specific purpose.  Only if it completely monopolizes the entire abstract idea is it out.  And on this record I don't think that conclusion can possibly be made.

Now, very briefly on willfulness, if I may.  We acknowledge completely all of the pre *Global-Tech* law that says you have to have for purposes of willfulness, and you have to

allege knowledge of the issued patent. All of those cases clearly are there. And if that's where we were, I would say the motion should be granted.

We're not there though. Because the Supreme Court spoke recently on a highly related question in *Global-Tech*. And in *Global-Tech* -- granted, it was not a willfulness case, it was inducement. But the precisely same issue was addressed by the Supreme Court in *Global-Tech*, which is: What is required to show knowledge of the patent? And there they adopted in the context of inducement this willful blindness test.

And Amazon's response to that is: Well, that's not in the wilfulness context. That's in the inducement context. Which, of course, is true, but doesn't answer the question. If it's the same issue, i.e., what is sufficient to show knowledge of the patent for purposes of patent law, then it's not -- doesn't end the inquiry that the Supreme Court was only addressing it in the context of inducement rather than willfulness.

Judge Seeborg in the *Vasudevan* case addressed that precise question. And in the *Vasudevan* case he expressly said that you can -- when you're trying to show willful blindness as a alternative to actual knowledge of the patent in the context of willfulness. There is no debate that Judge Seeborg in *Vasudevan* was talking about willfulness. And he explicitly applied the *Global-Tech* framework in that context.

In that case Judge Seeborg found that the pleading was

inadequate, but what's critical is what he found missing. Because what he found missing in *Vasudevan*, is what's present here.

What he found missing in Vasudevan, as he put it, that:

"The defendant subjectively believed there was a high risk of infringement."

That's the evidence that he found was lacking.

Now --

THE COURT:  And mere knowledge of a pending application was not enough to satisfy that.

MR. POWERS:  Precisely.  But what created -- what's different here from *Vasudevan* is the allegation that is present; that they adopted and were exposed to and adopted our technology.

So when you have copying, that creates a greater possibility, if you will.  That creates a possible inference of exactly what Judge Seeborg found was lacking there, which is a subjective belief of a high risk.

It's one thing --

THE COURT:  High risk of infringement?

MR. POWERS:  Exactly.

THE COURT:  You may know the process.  You may copy the process and you may know there is a patent application. I'm not sure that answers the question whether you knew -- part of that turns on what was your assessment and the basis of that

assessment that this patent was likely to issue.

MR. POWERS: Precisely. There's two components, but the two components interplay.

My point is that the copying -- when you deliberately copy -- for purposes of just the argument, obviously, we're not here to prove the facts, but if -- if you take a plaintiff's product and you copy it word for word down to the nits --

THE COURT: It shows that you're confident that it doesn't violate. It doesn't infringe.

MR. POWERS: If there is a patent on it, you know you're going to be really subject to it.

THE COURT: If there is a patent on it, yes.

MR. POWERS: And when you know that a patent was pending on it, the fact of copying creates, we would argue under willful blindness, an obligation to go look.

And when you look at the facts of *Global-Tech*, the facts here, as alleged, are more extreme than the facts in *Global-Tech*. Because in *Global-Tech* there wasn't even knowledge of the pending patent application.

THE COURT: I understand that.

All right. I will take this -- I will take it under submission. I understand your argument.

MR. MOORE: Your Honor, can I make two points?

THE COURT: Very brief.

MR. MOORE: Thank you, your Honor.

First, as to the allegations on willfulness.  They have come up with this *Global-Tech* theory in their opposition brief.  But the allegations -- even assuming that that's a viable alternative theory, the allegations don't remotely state a plausible case for willful blindness.  So they fail in those terms.

**THE COURT:**  What more would need to be alleged in addition to copying and knowledge of the patent application?

**MR. MOORE:**  Well, in this kind of case, your Honor, where you've got a nine-year history, where various applications had been rejected, you -- I think you would want a lot more allegations to suggest that they acknowledge that this patent had actually been issued.  I mean, the mere fact that it had been rejected nine times over that period in itself, I think, destroys any willful blindness claim.

Secondly, just to return very briefly to the 101 issue, I think my friend is just completely wrong that they can just by simply narrowing what they are claiming, get a patent on the abstract principle of the pricing that they are claiming. *Bilski* wouldn't have come out differently if the plaintiff in that case, the defendant in that case said, "Oh, we're just claiming transaction-based hedging."

And what the question is is whether or not the claims had anything significant, any significant additional component to the abstract concept itself.  The claims in here don't because

all they claim is pricing, pricing optimization.

The fact that it's offer-based pricing doesn't add any significant limitations.  The claims in *CLS Bank* did add a limitation because they used the computer and the shadow records in a particular way that made that settlement exchange concrete and particular in a way that simply saying we're going to claim price optimization using offer-based pricing has no limitation whatsoever.

**THE COURT:**  All right.  Let me ask you a question.

We have a case management conference also scheduled and I'm part of me feels I'm going to have to resolve this threshold question before we get into far into setting other matters in this.

But I do want to peek ahead and get a sense of whether or not you are contemplating, for instance, if I were to deny this motion to dismiss, an early summary judgment motion based on, for instance, non-obviousness or nondisclosure or lack of specification, anything else short of going through the lengthy discovery and claim construction process.

**MR. MOORE:**  Your Honor, I think we would certainly contemplate summary judgment and we would think of other defenses.

I guess I would say, though, that the Supreme Court in *Mayo* recently made clear that the fact that there may be other reasons that the patent is invalid under other provisions is no

reason for the Court's not to make the threshold inquiry under 101; that 101 is an important threshold inquiry.

And we recognize that the Court has some discretion there, but the Supreme Court has just made that crystal clear, that it's a threshold question. And where patents flunk the 101 inquiry, the role -- it's undeniable that it's a legal question. The role would be to resolve it at a dismissal.

THE COURT: Well, I understand that. There is also some indication that it is such a high bar that a District Court ought to be very cautious in ruling on a 101 claim. If there is any really doubt --

MR. MOORE: But, your Honor -- and I certainly appreciate that. I guess what I would say is the reason to wait would be if there are issues of claim construction or the like or -- I mean, we haven't heard anything today about the need for claim construction or the like.

This is a purely legal question that your Honor can and we would respectfully submit should answer based on the law and what's in the claims.

MR. POWERS: If I may have thirty seconds more on willfulness? Just 30 seconds, your Honor. Two points.

THE COURT: Yes.

MR. POWERS: One is all the arguments that were made really only apply to pre-complaint willfulness because post-complaint, obviously, would know about the patent.

Second as to the nine-year argument in prosecution that counsel made both here and in the briefs, that goes to weight. That's an argument about whether, in fact, it was reasonable that they had a high risk or not.  That's an argument that goes to the merits.  That's not an appropriate argument at the pleading stage.

THE COURT:  Well, it goes to perhaps the plausibility.  It's one of the circumstances and it informs plausibility or not of a willfulness.

You know, I left my CMC folder back in the office.  Let me...

MR. POWERS:  I have a copy here, if you would like.

THE COURT:  What I would like to do -- and the reporter has been going at this for almost two hours -- is take a short break.  I have one more major case after this.  But I do want to look at the CMC situation, see whether there is something we should resolve by scheduling today.

I did want to ask you this question:  Whether you were contemplating something, sort of an early summary judgment motion that would be in advance of -- really, almost on its face kind of a motion.  I'm just curious whether you have.

MR. MOORE:  One thing I'd stress is Amazon sees this case, it's not just Oip versus Amazon.  Amazon is getting hit by these, you know, Supreme Court calls them dubious businessmen patents all the time.  It sees this 101 issue as

critical.

It certainly believes that as other defenses and certainly other defenses it would bring --

THE COURT:  You want a 101 ruling.

MR. MOORE:  We want a 101 ruling.

Now, we do have other defenses, but we do think it's a critical issue that affects the economy and it is that important to Amazon when they are getting hit with these patents.

THE COURT:  Okay.  Let's take a 10-minute break and let me look over the CMC stuff for a moment and let me come back and see if there is something I need to do.

(Whereupon there was a recess in the proceedings from 3:20 until 3:33 p.m.)

(Discussion held off the record.)

MR. POWERS:  The aspects of the order that I want to focus your Honor's attention on are, first, Paragraph 3 and then Paragraphs 10 and 11.

Just for context, Amazon knew that basically what they want to have happen is that if you exceed the set order of search terms for custodians, then presumptively fee shifting or cost shifting is imposed.

And that is -- what Judge Grewal's order did was a bit more nuanced approach to that, and we think it's important to look at how he did that.

First, in Paragraph 3 he adopted presumptively the approach that we were proposing, which is that costs are shifted pursuant to the Federal Rules.

Then in Paragraphs 10 and 11, he set out a staged sequence of the numbers of custodians and number of search terms, which went beyond the number of search terms and custodians that the parties have agreed to here and said:  Only if you're going to exceed those much larger numbers of search terms and custodians, then, as he says in the last paragraph, "...should a party serve" -- last portion of the Paragraphs 10 and 11:

          "...should a party serve production for
     email requests for additional custodians.
     Beyond these the requesting party shall bear
     all reasonable costs."

So what Judge Grewal did was say, okay, I see the model nine, the model nine approach, but that really only makes sense if you set sufficiently high base lines that exceeding that would then justify that sort of fee shifting.

What we've done here is agree on a lower number of custodians and search terms, which would then be appropriate for the normal Federal Rule fee shifting or cost shifting, which says, let's look at it when it comes up and your Honor makes a decision and calls a ball and a strike.

And I'll just give you an example because -- and this relates to the willfulness allegation as an example.  If and

when we get there, there are probably 12 to 15 people who were at Amazon at the time who were interacting with Oip's personnel in receiving this information and responsible then for Amazon's, as we understand it -- but obviously we haven't had discovery yet, responsible for Amazon's implementation of what we're going to contend is the infringing technology.

To say that you're presumptively limited to 10 and if you exceed that, you have to shift costs, really doesn't make any sense --

**THE COURT:**  All right.  But if we keep the cost shifting in place, you want a higher number.

**MR. POWERS:**  We want a higher number, exactly.  Or, there is really two ways to do it that make sense.

Either you put a much higher number on it that is based on the discovery, or you're flexible at the beginning and you say: We'll start with this number and if you need more than that, you come back to me and I -- if I think you're right and it's reasonable, I don't presumptively shift the cost because you're right and it's reasonable.

And once we have some discovery, we will know how much more is --

**THE COURT:**  There is always room for good cause to come back on good cause to ask for an amendment.  Whether you call it ability to exceed this without incurring costs or amendment to the order, I don't care what you call it.  But

we've got to start with some presumptive number to keep some things under control.  You know, what was represented in this statement, I thought, was doubling those numbers to 10.

MR. POWERS:  We did.  And our only point is they are asking effectively for a presumption if you exceed 10, the cost will be shifted.

Our point is if you want a presumption that costs are shifted, then you should actually set the number larger.  What we proposed was an approach that we set the number where it is and leave to the normal federal rules discussion with your discretion whether costs are shifted based on the nature of the request, which seems like a -- like the approach that your Honor was just discussing, saying it doesn't matter how you call it, if you could call it amendment or anything else.

THE COURT:  Like the amendment on the number of depositions.  You get 10 and if you need more, you know, you can't stipulate.  You come back to me with a specific showing.

MR. POWERS:  Right.  Our only point was you shouldn't have a presumptive cost shift based on a smaller number of initial custodians.

THE COURT:  That is a prophylactic effect.

MR. MOORE:  This is a patent case.  Mainly, the patent and how the product works.  This is not a case about employment discrimination or something where emails are critical.

**THE COURT:**  Still, there may be reasons to exceed that.

I'm going to start with the basic of 10.  There will be a provision there for good cause to come back and change it.  I expect you to meet-and-confer and in a specific situation if you need to exceed that, I would expect the parties to discuss that.

**MR. POWERS:**  Understood.

**THE COURT:**  If you can't resolve it, come back and we'll look at it.

Same with the search terms.  There may be good reason to exceed that.  I don't know enough about this case at this point to make that judgment.

**MR. POWERS:**  Thank you, your Honor.

**MR. MOORE:**  That 10 will be the presumptive limit because what we need is that those -- the whole purpose the Federal Circuit issued this order is for the cost shifting to strike the balance between the cost of the email discovery and the value of email discovery.  To strike that balance.

So if they identify 10 people that are marginally relevant and they don't really need and they come back with some important people later --

**THE COURT:**  Well, it's a risk.  If you burn your 10 on non-important people and then you come back to me and say, "Now I need another 20 because we have these peripheral

people," I may end up saying no.  That's the risk.

MR. MOORE:  Thank you, your Honor.

THE COURT:  You're proposing amendments of the pleading by December 7th.

MR. MOORE:  The only thing Amazon is proposing there is delay that 20 days.  And the only reason we're proposing is delay those initial disclosure dates 20 days is so that this Court has time to decide the 101 issue.

THE COURT:  All right.  Well, then, that gets to the ultimate, the briefing schedule that you have proposed side-by-side here.  And I'm inclined -- because this is a complicated issue, I'm going to have to look at this very closely.  I'm going to need some time.

And so I am going to go with the -- if you look at Appendix B with the Amazon schedule, but up through just the claim construction hearing, I think I'm not going to set further dates until we get to that because too many things can jump off the rail and I don't want to completely reset dates.

But I will get out a scheduling order that pretty much tracks the right column on that and, also, with respect to the pleading date, because it will take me a bit of time to resolve the 101 question.

MR. POWERS:  Understood, your Honor.

THE COURT:  All right?  Thank you.

So we have a further --

(Discussion held off the record between the Court and the Clerk.)

THE COURT:  Oh, settlement conference.  There is reference in here that you would like to go to Judge Spero, is that right?

MR. POWERS:  Yes, your Honor.

THE COURT:  And what, timing-wise?  Anything I should tell Judge Spero in terms of timing?

MR. POWERS:  I think I -- we have had some prior discussions about that.  I think we're in agreement that the first meeting probably ought to be around the time of the claim construction briefing or hearing.  Somewhere in advance of the hearing probably or at least the decision, but in that time frame.  I don't think we have had a discussion about anything more concrete than that.

THE COURT:  All right.  Do you --

MR. MOORE:  That's fine with us.  We've got the 101 issue is first and foremost on our mind.

THE COURT:  Right.  So prior to maybe mid-February?

MR. POWERS:  Yes, your Honor.

THE COURT:  Okay.  And for further -- we don't have a further CMC date.

THE CLERK:  Today is the CMC date.

THE COURT:  Maybe sometime in November, as we begin to exchange -- assuming we get there -- information with

respect to claims to be construed, et cetera.  Just see how we're doing.

THE CLERK:  November 9th at 10:30.

MR. POWERS:  Very well.

THE COURT:  All right.

MR. POWERS:  Thank you, your Honor.

THE COURT:  Thank you, appreciate your argument.

(Proceedings adjourned.)

**CERTIFICATE OF REPORTER**


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Debra L. Pas

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, August 8, 2012